and let me make sure I've got the lineup correct. Mr. Da Silva, you're going to go for the appellants. You're going to go for ten minutes and then have five minutes of rebuttal. And then on the other side we have Mr. Allen for Sargent and Kirkide. I hope I pronounce that correctly and that's nine minutes. And then Mr. Kramner for Comerica for six minutes, right? Okay, then we're ready to go. Mr. Da Silva. Good morning, your honors. May I please the court. My name is Rodrigo Da Silva and I have the privilege of representing the three appellants, Worldspan Marine Inc., a Canadian corporation, and C-SPAN Financial LLC and Wetmore Financial LLC to Florida Limited Liability Companies. Before I get into my legal argument as to why this court should reverse the order granting the dismissal of our complaint with prejudice, I'd like to briefly make a presentation of the facts because this case involves a very complex factual matrix. Well, let me give you one little bit of caution. The facts here are at least as laid out in the complaint are very, very complicated. So if you're gonna do that, make sure you don't run out of time. Yes, your honors. I will. It's a long, long, detailed story. But it's your argument, so that's what you want to do. Go right ahead. It's gonna be very relevant to the short complaint. The appellees and the district court made a big deal in the fact that we allege a lot of facts and allegations about third parties and litigations between third parties and the defendants. The relationship between those claims or those RICO predicate acts to the predicate acts and the claims that my clients asserted in this case. This is a multi-year complex RICO enterprise that had various victims besides my clients, but they are all connected to the same set of facts arising from the IOTC contracts, the fuel supply contracts. Two of the victims of Mr. Sargent's schemes, Mr. Al Saleh, which I had the privilege to represent, and Supreme Fuels, which I am currently counsel of records, obtained fraud and RICO judgments against Sargent and his alter ego corporations. Then they claim, they went to Canada and claim against my clients world spans super IOT. The same super IOT that we allege in this case was devalued by the defendants through their RICO scheme and their own set of predicate acts directed at my client. In addition to the fraudulent scheme undertaken against Al Saleh and Supreme Fuels, the defendants in this case undertook what we allege is a fraudulent trade bid scheme where Sargent has the pattern of using banks such as Comerica to collateralize and protect assets through a security interest, then to default and have another corporation acquire that security interest to foreclose and transfer the asset, which might be subject to attack in the case of Al Saleh and Supreme Fuels, to put in another entity that would be judgment proof. I don't know if I understand the facts alleged well, but I thought that your client agreed to Comerica taking the security interest when it agreed to loan the money to Mr. Sargent and his company. Is that right? That's not right, your honor. I thought they needed your client's consent. Then they needed the consent for the assignment. Right, the assignment which gave them the security interest. Correct. They wouldn't have had an interest had they not loaned money on the vessel for the vessels building, etc., right? Well, that's partially correct. The first amount of money, the first amount of money, whatever, amount it was, and I forget what the amount was, was put up by Mr. Sargent, right? By his alter ego corporations, IOTC. Okay, so that was the first tranche of money, and then Comerica came in and provided additional funds in return for an assignment, right? The assignment preceded the payments by Comerica under the construction loan, that's correct. Right, because they weren't going to give any money unless they got the assignment and you had to consent to the assignment. Correct, and we consented. How does that fit into? I'm not sure, this is my own personal opinion, and I don't speak for either of my colleagues. I'm not sure that your complaint, although it was very, very long, was in every respect a shotgun complaint. It may have been difficult to follow, it may have been overly long, but I'm not sure it falls under the definition of shotgun complaint in our circuit. Having said that, I've read the complaint several times, I still don't understand what's going on. I mean, everything you've laid out in those hundreds of pages is so complicated that I can't follow it, and if I can't follow it, it's hard for me to decide whether or not it states any of your claims state a claim for relief under Rule 12b-6. That's my personal issue with your claims. I understand. I can't figure out what's going on. I understand, Your Honor. That's why I'm doing this factual presentation. Alsaleh was cheated by Mr. Sargent out of the IOTC contracts, and he engaged in several acts of wire fraud. There is a fraud judgment affirmed by the Florida Supreme Court. Let me see if I can summarize, because I want you to be able to get to your arguments. You claim that Mr. Sargent and his alter-ego companies began by defrauding partners with whom they had shared in contracts dealing with the U.S. government in overseas conflicts. They defrauded them, took money from them, used that money, which were unlawful proceeds, to do things like pay your client for the building of this super yacht, and then engaged in some credit bid scheme where they had assigned their interest to Comerica, and now Comerica stepped into Mr. Sargent's shoes. And then when they didn't pay, Comerica had a higher priority than your client did on the yacht, and so when things went south and your client didn't get any money, Comerica stood in front of you, and you couldn't take the yacht back in REM for your debt, and you failed in the Canadian proceedings. Is that your RICO claim? That's my RICO claim. For many years, Comerica, I have never seen a lender take affirmative steps to devalue their collateral. Lenders don't take actions to devalue their collateral, and what they did here is they made filings in Canada comparing the super yacht, a 22 million dollar super yacht, making it as obsolete as a Commodore 64 computer. No lender would have taken those affirmative steps to devalue the yacht, and they did that because we own the yacht. My client owned it. The buyer and Comerica's assignee only had a security interest, and they wanted to take possession of the yacht, and they wanted to take possession of the yacht in a way that Mr. Sargent would not lose it to Supreme Fuels or to Al Saleh. So our complaint doesn't meet any of the requirements because we had separate counts that didn't incorporate preceding counts. The allegations that we had about third parties were relevant because, for example, we wanted to give the explanation of the BTB grade fraud, where Mr. Sargent performed a similar fraud in Texas, where he had another legitimate lender participate in, and a refinery went on a great big sale for 22 million dollars, and when it was reversed by a Texas federal judge, ultimately sold for four times that amount. So all of those allegations were relevant. We had separate counts. Allegations might have been lengthy, but this is a very complex civil RICO enterprise that went on for years and years with multiple victims, and our clients suffer. The other thing is they suffer domestically. What was the RICO enterprise? The RICO enterprise was the association between Mr. Sargent, Mr. Monger, Comerica Bank. The bank is at Comerica Bank. Mr. Kevin Kirkidee, which is an accountant that works for Mr. Sargent, and he's the brains behind the grade bid fraud scheme that he also perpetrated in Texas. And they all got together, and all the money that went into the ad were proceeds of money laundering. They engaged in wire fraud by submitting false affidavits, we allege, to the Canadian courts. Mailings from Florida to Canada. Travel from Florida to all with the purpose to perform the grade bid scheme. When we learn about the grade bid scheme in 2014 is when we finally realized why for so many years they were trying to devalue the yacht. Now, I don't mean this in a pejorative way, but if you say that the money that Mr. Sargent and his alter ego companies paid for the beginning of the construction of the yacht were fraud proceeds, your client kept those fraud proceeds, right? We kept them, but we didn't know. We were, we did not participate. I'm not suggesting any improper conduct on the part of your clients, given what the complaint alleges. I'm just saying, you kept those proceeds. Yes, Your Honor. So your loss has to be something beyond the proceeds. Right. We, yes, we paid our vendors, and we, they stopped making payments, and as a result, it was a house of cards. We collapsed, the entire company was destroyed, because the trade creditors seized, the vessel was arrested in a maritime proceeding. Before I run out of time, I want to quickly go through domestic injury. WorldSpan assigned all of the assets to C-SPAN, a Florida LLC, through an assignment which assigned not only present assets, but future undertakings. The Seventh Circuit, this circuit has not spoken about domestic injury, but the Seventh Circuit has says that an intangible property, the series of that properties were the principal place of company, or the principal place of business, of the title holder. And in this case, C-SPAN is a Florida LLC. Did WorldSpan plausibly allege a domestic injury, and if so, where and what? It did, because WorldSpan, 100% of its business was selling super yachts to US customers. This particular super yacht was going to be sold to Mr. Sargent, and it ultimately was sold to another Florida resident. The yacht is in Florida at this time. The company's sole client base was US customers. So the company, although had operations in Canada, all of it was the US business. So it was similar to the Gold TV case from the district court, where a Uruguayan company was trying to get television rights for a soccer tournament in the US. The court then held at the motion to dismiss stage that the plaintiff then had alleged sufficient facts to plead domestic injury, because there was US business involved, albeit for a foreign company. Aren't you alleging, though, that WorldSpan was injured, and then C-SPAN was injured because it acquired the assets of WorldSpan? Correct. Okay, so I don't understand then how C-SPAN was, how there was proximate cause as to C-SPAN. Because C-SPAN had an assignment to all that. C-SPAN had lent money to WorldSpan, and in exchange for those monies, got an assault. C-SPAN had an interest on everything, the real estate, the equipment, the superyacht itself. And when everything went sour, and this yacht sold for a very low amount, the company couldn't recover anything, and so couldn't C-SPAN. And Wedmore is a shareholder, and one of the principles is that usually a shareholder doesn't have standing. But if you shut down WorldSpan on domestic injury, then there is no double-dipping. Because the theory about not allowing a shareholder to recover under a RICO claim is because you don't want double-dipping. So if the court shuts down WorldSpan on domestic injury, that principle does not apply. And Wedmore, whose equity interest now is down to zero, would not, you know, also have a separate and distinct injury. But the question is, how is his injury different from any other shareholder? It's a 75% shareholder, and it's the same as that of the corporation? It is, well, it's different. The equity in a company that was worth lots of millions now is zero, because it's a company that is no longer a growing concern. So as to each 75% interest is individualized to that shareholder. The other 25% shareholder has, you know, a different equity interest that was also reduced to Mr. Allen. Thank you, Your Honor. May it please the court. Scott Allen on behalf of the sergeant defendants, Harry Sargent III, Deborah Sargent, Kevin Kirkheide, and Mervyn Munger. The dismissal with prejudice was appropriate for four reasons. First, the amended complaint is a shotgun pleading. Second, plaintiffs ignored the district court's detailed instructions on how to amend their complaint. Third, plaintiffs waived their ability to amend by not filing a motion or a proposed amendment with the district court. And fourth, any amendment would be futile under the Iqbal Twombly pleading standards and substantive law. The original complaint was filed three and a half years ago in May 2018, and the plaintiff should not be allowed to continue to abuse the judicial process and waste the court's and party's resources. All right, let's talk about it was, there was no improper incorporation of counts into counts, right? Correct. That was the, you know, one of the few improvements that the plaintiffs had from the original to the amended complaint. So that, so that, so that is gone as a possibility of a shotgun pleading. You're left with the other possibilities, right? Your Honor, we would only concede that it was an okay. That's what we're here to talk about. But one of the categories we've described of a shotgun pleading is where you have counts, you have count one and then count two not only incorporates factual allegations and procedure allegations, but also incorporates count one into count two, and then count three incorporates counts one and two, and four incorporates one, two, and three. We don't have that here, right? That is correct. Okay. However, I know you think there are other problems, but that's not one of them in the shotgun pleading sense. Correct. I would add, though, that the RICO counts incorporated all 443 factual allegations, and the other state law claims still incorporated hundreds of allegations, and I think... Why is that improper? So... That may, that may be a failure to state a claim, or you may want to ask for a more definite statement, but why is that a shotgun pleading? I will agree that that alone does not render it a shotgun pleading, and I, as you know, Mr. DaSilva was unable to articulate his theory in a, you know, coherent way. Okay, so what's the shotgun pleading problem then? But before you, if I might just jump in for one second, there were seven counts, maybe an eighth. How many of those counts incorporated the 443 paragraphs? I believe, I don't know, I believe it was the RICO counts. There were two federal RICO counts, and there were two parallel state RICO counts, right? Yes, that sounds correct. I believe it was... Those four counts, did they incorporate all those paragraphs, 443 of them? That was my understanding, Your Honor. Okay, then you had a couple of fraud counts, and a negligence, negligent misrepresentation count, and a conspiracy count. Did they incorporate all or some of the 443? Not all, but hundreds, Your Honor. All right, so your position is, at least in part, the complaint's allegations had this problem of multiple counts repleting hundreds of paragraphs. Your Honor, I believe that that is a problem, but I don't want to distract, I think, from our stronger arguments. Okay, why don't you get to it then? Okay. The unifying characteristic of a shotgun complaint is that it fails to provide defendants adequate notice of the claims against them, as this court noted in Weiland and Embry. Here, the complaint includes conclusory, vague, and immaterial facts. That is one aspect of a shotgun pleading, and another is that it includes multiple claims against multiple defendants without specifying who is responsible for what conduct, as this court noted in Vibe Micro, Inc. This court does not tolerate shotgun pleadings, and the policy reasons, as this include, that they waste judicial resources and result in an overly broad scope of discovery. And here, you have an alleged scheme that spanned 10 years involving multiple events that are dealt with in other lawsuits, and discovery would truly be unmanageable. I mean, there's, I, to be frank, and I told Mr. DaSilva, I don't understand everything that's going on, but I could articulate, I could figure out some of the allegations, and that is that, as I told him, so you tell me what is unintelligible about this aspect of it. Now, I'm not saying this states a claim, but in terms of understanding what is alleged, your client, alleged, I'm saying all of these things are alleged. Your client, Mr. Sargent, allegedly stole funds from a business partner arising out of a business in part to purchase and fund construction of this vessel, and in order to shield that asset from the partner he had defrauded, he engaged with Comerica in an assignment scheme where Comerica would get an assignment and therefore record a security interest in exchange for lending money. Comerica would then stand in the before world span in terms of creditors when things went south, and you would shield anybody, including the former business partner, from getting at Mr. Sargent because he had assigned his interest to Comerica, and that all wrapped up in a nice little bow is a RICO scheme. That's not understandable from the complaint, at least against Mr. Sargent and his, and Comerica? Your Honor, I think this Court has held that the issue is just not whether you're able to articulate it, but whether the defendants have notice of the claims against them, and our position is that we do not have notice given the inability to tell what is relevant and what is not, and I believe Mr. De Silva began that the scheme began with fuel supply contracts overseas, and I think you articulated a theory that does not rely on that aspect as much, but it is still, in our view, a shotgun pleading. Regardless of whether it is a shotgun pleading, the dismissal was still appropriate because plaintiffs ignored the Court's clear and specific instructions on how to amend their complaint. It included that they must not include irrelevant lawsuits, parties, or events, and concisely state what the claims are, which they failed to do. In addition, plaintiffs waived the right to amend because they did not file a motion to amend their complaint with the District Court. As this Court noted in Ceda Trust, Posner, and Newton, filing a motion in the proper way that a plaintiff can seek to file an amended complaint and merely opposing a motion to dismiss is insufficient. And this is not merely a technicality, because what we are left with today is we have no basis for understanding how the plaintiffs, what a second amended complaint would contain, and this Court is just left to speculate on whether they could state a claim, which is the reason that we have the rule that plaintiffs must file a motion. In addition, any amended complaint would be futile under both Iqbal Twombly pleading standards and substantive RICO law and under Rule 9, which requires that claims sounding in fraud be pled with particularity. If you haven't seen an First, you know, plaintiffs did have a full chance to amend their complaint. Understood. And you said that they failed because they didn't ask, they didn't file a motion, they didn't file an amended complaint. I'm with you there, I got you. But you also talk about futility, and so my question to you is, without seeing a proposed amended complaint, how do you know it's futile? What principle of law makes every single claim futile? I think there's two aspects of that. First would be, under Iqbal and Twombly, this Court looks at what the, whether the claims are plausible. And what you have is a scheme over 10 years of Mr. Sargent, where he paid 21 million dollars, as alleged under paragraph 332 of the amended complaint, and he did not get his yacht, and he only got four million dollars in return. So that just makes no sense, and this Court can... Unless you believe that he and Comerica were in cahoots. So as part of a RICO enterprise, whereby Comerica gets an assignment. I mean, that's unusual, right? A lender getting an assignment? Not just a security interest, like a mortgage, and a deed or something like that, but an assignment of the asset, of the leisure cruising. Comerica, when it's done, how's Mr. Sargent going to get a hold of it? Your Honor, on that point, I believe that it is, you know, an issue that can be litigated in Canada that involves, you know, commercial transactions. I would add on the futility point, under substantive law, under RICO, plaintiffs cannot show domestic injury, and all of their alleged injuries were felt in Canada and not in the United States. It's a Canadian company, and the yacht was in Canada. All relevant events, at least in a way that you put their claim, occurred there. And on causation, that is another aspect that they cannot show, because all of their injuries, including destroying the business and devaluation of the brands, none of that is causally related to any of the allegations that they provide. All right, thank you very much, Mr. Allen. Thank you. Mr. Cranmer. Your Honor, may it please the Court, my name is Tom Cranmer, and I'm appearing on behalf of Comerica Bank, along with the individual Comerica defendants, who are Your Honor, despite the characterization of this particular case as complex, and I certainly agree that it is in some ways, in other ways it's a very simple case, because what happened here is Comerica did what banks do. It loaned money to one of its customers, in this case Harry Sargent, to purchase a superyacht, which supposedly was going to be acquired for 15 million dollars. Mr. Sargent ends up with 21 million dollars, and essentially gets no yacht. All he ends up with is a recovery of about 5 million dollars in Canadian funds. And Your Honor, I know the Court knows this, but we haven't talked about the standard of review here with regard to a shotgun pleading found under Rule 8.8.2, and that is an abuse of discretion. And I would respectfully submit to the Court that the magistrate judge in the lower court did not abuse their discretion. And interestingly enough, if you take a look at the transcript of the hearing that we had with regard to our initial motion to dismiss, the very first thing that the magistrate judge did was to indicate to Appellants Council, I want you to focus on the individual defendants, the individual claims, and tell me with regard to each defendant, what are the facts that you allege which support each of your claims? And respectfully, if you look at the transcript, I think you would see that that caught Plaintiffs Council somewhat off guard, and he wasn't really able to articulate that because it isn't found in the complaint, and he didn't have that information readily available. The magistrate judge then went so far as to essentially take a recess and say, I'll give you some time to kind of collect your thoughts, and why don't you come back in about an hour, as I said, Appellants Council fared no better. Appellants Council could not articulate with regard to each of the defendants what the particular allegations involved. And let me give you an example that I think really strikes at the very heart of that. The plaintiff, or excuse me, the appellant in this case would suggest, well, in our amended complaint we've set out with regard to each of the defendants, in particular the Comerica defendants, what the various allegations are as to that individual. And with regard to, for example, the estate of Kurt Yonker, what the appellant indicates is that, well, there were these RICO violations and there was wire fraud and mail fraud that occurred with regard to this particular RICO enterprise. What's missing is really the essence of what those allegations are. What was mailed? When was it mailed? What was the purpose of the mailing? And what did the mailing contain? And I think that's exactly what caused the district court in this instance to indicate that this was, in fact, a violation of Rule 8, that the allegations were either irrelevant, conclusory, or vague, and they didn't meet the standards set forth under the federal rules of civil procedure. Explain to me what, at least your understanding is, of the allegations in the amended complaint about the assignment that Comerica took. And I know the court raised an issue about that, that it was unusual or would be unusual. I'm not, I don't know, I know nothing about vessels and the vessel building industry, but I've never seen this before, never heard of it before either. Maybe it's commonplace. And I'll confess, Your Honor, I don't have any answer to that question. I don't know if it's commonplace or not. But certainly there was nothing that I saw that was developed in this record or pled which suggested that somehow they were in cahoots with the sergeant's defendants to engage in some type of multi-year conspiracy. It just, and I want to also add to that the fact that the appellants place a great deal of emphasis on this credit bid scheme that they talk about. The reality is that the credit bid was not accepted by the Canadian courts. They denied the ability of the defendants to exercise any type of credit bid. So I don't know where that gets them in terms of ultimately the claims that they're making. With the brief remaining time I have, let me touch just briefly on this issue of domestic injury. I think the RJR Nabisco case clearly indicates that in there has to be domestic injury. There is none in this case. WorldSpan is a Canadian company. The injuries that occurred occurred in Canada. And with regard to Judge Pryor's question, she asked about C-SPAN and asked whether or not there was any proximate cause as to C-SPAN. I think we could even take a step further back, Judge Pryor, and look to the fact that at the time the assets supposedly were assigned from WorldSpan to C-SPAN, the injury had already occurred. So the injury again remains in Canada, not in the United States. And with regard to the Wedmore aspect of this particular situation, regarding the shareholder claim, if you will, this court has already spoken to that. In fact, Judge Marcus did in the Mays versus Verani decision indicating I think very clearly that shareholder damages, if you will, do not equate to RICO standing. I see my time is up, so I thank the court. All right. Thank you very much, they make a great deal about waiving the right to file a motion to amend the pleadings. But the magistrate's report specifically said that she was not giving us the right to amend because she thought the amendment was futile. And I had to face, and my clients had to face, not one, but two Rule 11 motions to defend two Rule 11 motions, hopefully successfully. But I think it would have been probably malpractice on my part to move to amend after I get a ruling that she would not allow me any further amendments. My colleague from Comerica spent a great deal of time speaking about the hearing on the original complaint. But that's irrelevant. The operative pleading here is the amended complaint. And the amended complaint, about one third of it, has sections of each defendant and specifically alleges what each defendant did. We cure that deficiency. I have never seen a complaint that is more comprehensive in laying out sections of pages and pages as to what each defendant did. And to answer your Honor's question, it's not usual for a bank to assume the contract to purchase a $23 million superyacht on behalf of the borrower. And they haven't challenged what the record is. Comerica was the bank for BTV, BTV Refining LLC, the same entity that a federal judge in Texas found engaged in a fraudulent credit bid scheme where the refinery was sold for $22 million and then the fair market value was in excess of $100 million. As to the fact that the credit bid in Canada was unsuccessful, it is irrelevant because for 10 years they devalued my client's yacht. They devalued it and Comerica's own appraisers had valued the yacht in 2011 around $12 to $13 million. And Fraser Yachts, the largest luxury yacht broker, had valued it at $18 million. And at the time it sold in 2014, it sold only for $5 million because when a yacht, the electronics and everything else, they go to, in part, to waste. And they mouthed the superyacht. The community of buying superyachts is a very small community that can buy this type of vessels. And they both mouthed the superyacht across that community. They make all these findings in the Canadian court. At one time they opposed the landlord of the of WorldSpan's facility, wanted to get the yacht for $9 million, which was $4 million more that when it eventually sold. And opposed that sale. So the fact that it was ultimately unsuccessful because the court saw through it is irrelevant. The damage was caused. As to domestic injury, the C-SPAN assignment happened way before the injury happened because at the time it happened, the yacht was still valued, at least by Comerica's appraisal, to $12 to $13 million. And then in 2011, and then it sold for $5 million in 2014. And we also, WorldSpan, lost the opportunity to get the contract. The ultimate buyer for the $5 million superyacht is J.C. Maas, a local Florida businessman. He spent $30 million finishing the yacht. And we lost as a result of this conspiracy. We didn't lose the contract. What we allege is we lost the opportunity to get that contract because Mr. Maas knew that the amount of crazy litigation that went years and years and years, that he had to take the vessel out of our facility because if not, it would be entangling litigation for Canada for years. So not only was the company completely destroyed, we lost a great business opportunity to get the contract to finish the $30 million. And as to a shareholder, when a company is totally destroyed, I analogize it in my papers as an expropriation. When I was here before in the expropriation case of Comparelli versus Venezuela, a shareholder has a separate property interest. It has the interest to get dividends from its company. It has the value of its shares that it can sell to a third party. It has the right to participate in the distribution of assets in a liquidation. So there are many rights that belong to a shareholder that are separate and a part of the company. And that are especially true in this case, where if the court were to find that WorldSpan doesn't have domestic injury, there is no double-dipping. Someone has to recover. I see that my time is almost up. Unless the court has any other questions, I covered all of my points. All right. Thank you very much. We appreciate the help from all of you. Thank you.